UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | | |
|---|---|---|
| WILLIAM E. HESTER, III and KATHRYN H. HESTER, | ) ) ) | |
| PLAINTIFFS, | ) ) ) | |
| V. | ) ) | CIVIL ACTION NO: 3:26-cv-150-CWR-ASH |
| UNITED STATES TENNIS ASSOCIATION, INC., | ) ) ) ) | JURY TRIAL DEMANDED |
| DEFENDANT. | ) ) | |

## COMPLAINT

Plaintiffs William E. Hester, III ("Bill") and Kathryn H. Hester ("Katie") are the son and daughter of former United States Tennis Association President W.E. "Slew" Hester, Jr. Together, they file this Complaint against the United States Tennis Association, Inc. ("USTA").[1] In support, Plaintiffs state as follows:

## INTRODUCTION

1.      In 1977 and 1978, as President of the USTA and Chairman of the United States Open tennis tournament, Slew Hester spearheaded an effort to move the U.S. Open from a cramped, private club where it had been played for decades to what was, before Slew breathed life into the property, nothing more than the ruins of an abandoned stadium in Flushing Meadows. Slew oversaw the construction of a world-class tennis facility at the site, and, in just ten months, built a facility fit for

---

[1] Plaintiffs will file a Motion for Preliminary Injunction.

1

one of the world's four "Grand Slam" tennis tournaments. Slew's vision and leadership are widely credited for transforming the U.S. Open into the global (and profitable) spectacle it is today. Rightly so, the complex—formally known as the National Tennis Center—was informally dubbed "The House That Slew Built." For nearly a half-century, every U.S. Open has been contested there.

2. Of the many honors and awards Slew received for his contributions to tennis, the most treasured was the USTA's grant of lifetime box seats to him and to his heirs at old Louis Armstrong Stadium, which was at one time the show court for the U.S. Open's top matches. There was no better seat in the house, and the family attended year after year until Slew passed away in 1993. Around that time, the USTA's attitude toward the Hester family changed.

3. In 1997, the Hester family and the USTA butted heads over the Hesters' seating rights inside Arthur Ashe Stadium—a new addition to the National Tennis Center built to host the premier matches that Louis Armstrong Stadium had hosted for nearly 20 years. Litigation ensued, and the parties ultimately reached a settlement agreement that, among other things, granted the Hesters lifetime subscription rights to a premier "box" inside Arthur Ashe Stadium for an "applicable annual charge," which at that time was $45,000.00 per year. The box granted by the settlement agreement was Box 38G; it later became Box 35G after a reconfiguration of the lower bowl of Arthur Ashe Stadium.

4. In the thirty years since, the USTA has at every turn worked to undermine the settlement agreement and freeze the Hesters out. Over the same

2

time, the USTA has slowly worked to erode Slew's legacy ties to the tournament. Now, the USTA says that it will eliminate Box 35G—the lifetime box promised to the Hesters under the 1998 settlement agreement—for the 2026 U.S. Open. And, according to the USTA, the Hesters' only recourse is to fork over almost half a million dollars for inferior seats. Out of necessity, Plaintiffs Bill and Katie Hester bring this Complaint to vindicate their rights.

## PARTIES

5.    Plaintiff William E. Hester, III is a citizen of the State of Louisiana.

6.    Plaintiff Kathryn H. Hester is a citizen of the State of Mississippi.

7.    Defendant United States Tennis Association, Inc. is an entity formed under New York law; its principal place of business is New York City, New York.

## JURISDICTION AND VENUE

8.    The Court possesses subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Plaintiffs are citizens of Louisiana and Mississippi. Defendant is a citizen of New York. The amount in controversy exceeds $75,0000, exclusive of interest and costs.

9.    Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred here.

## FACTS

### A. "The House That Slew Built"

10.    Born in Hazelhurst, Mississippi, in May of 1912, W.E. "Slew" Hester reshaped American tennis.

3

11.     Slew was a multi-sport athlete who excelled at tennis from an early age. His skills with the racquet lasted decades. From 1925 to 1977, Slew won over 500 state, sectional, and national tennis tournaments. His love for the game rubbed off on his son, Bill; the pair reached the finals in four national father-son doubles competitions.[2]

12.     Slew's excellence stretched beyond the tennis court. During World War II, he helped supply Allied forces as a member of the storied "Red Ball Express." His country awarded him a Bronze Star for his service.[3]

13.     After the war, Slew spent several years working various sales jobs. In 1955, he began his "wildcatting" career—selling participation interests in prospective oil wells. He did well.

14.     All the while, tennis remained at the center of Slew's life. He served as president of the Mississippi Tennis Association from 1954 to 1958 and as president of the Southern Lawn Tennis Association from 1964 to 1966. His stint on the executive committee of the Southern Lawn Tennis Association spanned 15 years, from 1964 to 1979.[4]

15.     In 1964, Slew was the USTA delegate who pushed to move the Davis Cup Challenge Round to Cleveland, Ohio, after it had been a fixture at the West

---

[2]     *W.E. "Slew" Hester*, MISSISSIPPI SPORTS HALL OF FAME AND MUSEUM, https://msfame.com/inductees/w-e-hester/ [https://perma.cc/XKS9-YNLU].

[3] Neil Amdur, *Deep South's Slew Hester: A Canny Tennis Maverick*, N.Y. TIMES (Mar. 20, 1977) (attached as Exhibit A).

[4] MISSISSIPPI SPORTS HALL OF FAME AND MUSEUM, *supra* n.2.

Side Tennis Club in Forest Hills, New York ("Forest Hills").[5] That moxie and forward-thinking portended the events that made him a legend.

16.    By 1974, Slew was serving as the first vice president of the USTA. Three years later, he became the first "deep Southerner" to serve as the organization's president.

17.    Soon after his election, Slew had an idea that would change the sport forever. He would move the U.S. Open from Forest Hills—a private club where the tournament had been played for 60 years—to a then-rundown property owned by the City.

18.    As the story goes, Slew was peering down on New York City from a flight en route to LaGuardia when he spotted the snow-covered remains of the old Singer Bowl, a rectangular stadium built in Flushing Meadows to host the 1964 World's Fair. When the World's Fair concluded, the NYC Department of Parks and Recreation took control, using the site for concerts and other events. The stadium enjoyed a few good years afterward. But by the time Slew's jet passed by, the property had fallen into decay.[6]

19.    At the time, Slew was locked in heated negotiations with Forest Hills over the renewal of its U.S. Open contract.[7] Slew had an idea: he'd trade the private

---

[5] Amdur, *supra* note 3.

[6] Barry Lorge, *Hester's Folly Becomes Fine Site for U.S. Open*, The Washington Post (Aug. 28, 1978) (attached as Exhibit B); *see also* USTA Billie Jean King National Tennis Center Quick Facts at 40–41 (attached as Exhibit C).

[7] Bud Collins, *"Slew" Hester took his USTA show up the road to Flushing Meadows*, Sports Business Journal (Aug. 4, 2003),

partnership for a public partnership, "yank[ing] tennis out of the country club [and] launching the democratization that transformed the face of this once thoroughly elitist game."[8]

20.     Convincing NYC officials was step one. Slew asked his friend, Moon Landrieu, the former Mayor of New Orleans and later Secretary of HUD under President Jimmy Carter, to broach the topic with NYC Mayor Abraham Beame. Eventually, Slew ended up in a room full of NYC decision-makers. In just four hours, he secured $10,000,000.00 in financing and a 15-year lease on the site at Flushing Meadows.[9] The National Tennis Center was born.

21.     In a joint press conference held in late May 1977, Mayor Beame and Slew announced the move to the public.

22.     Many people second-guessed the move. Tennis traditionalists balked at moving the event from a charming private club to a public site once coined by author F. Scott Fitzgerald as a "valley of ashes."[10] Forest Hills launched a public

---

https://www.sportsbusinessjournal.com/Journal/Issues/2003/08/25/US-Open/Slew-Hester-Took-His-USTA-Show-Up-The-Road-To-Flushing-Meadows/ [https://perma.cc/X2WZ-AU5N].

[8] Peter Bodo, *Tennis Built it and They Came*, ESPN (Aug. 26, 2018), https://www.espn.com/tennis/story/_/id/24484414/tennis-built-national-training-center-flushing-new-york-changed-sport [https://perma.cc/8JJ6-FWUY].

[9] Sports History Weekly, *An Oilman Reshapes American Tennis* (Sept. 6, 2024), https://www.sportshistoryweekly.com/stories/tennis-us-open-flushing-meadow-william-hester,1231 [https://perma.cc/JFT6-TCEZ].

[10] Collins, *supra* note 7; *see also* Blair Henley, *William Hester's vision took the U.S. Open in a grand new direction* (Dec. 12, 2016), https://www.tennis.com/news/articles/william-hester-s-vision-took-the-u-s-open-in-a-grand-new-direction [https://perma.cc/9L72-WL3G].

push-back campaign marred by scare tactics and racial undertones.[11] "Skeptics insist[ed] that Hester [wa]s moving himself into no man's land by leaving the secure confines of the West Side Tennis Club and rallying with New York City politicians. But others who ha[d] watched him hit winners with 85 to 90 of his 200 oil digs and then pour his time and enthusiasm into tennis [wer]e believers."[12]

23.    Critics aside, the most daunting challenge was completing construction in time for the 1978 U.S. Open. Slew had 10 months to get it done. "Most people familiar with New York construction believed this was next-to-impossible, and that the ol' wildcatter would be eaten alive by the industry."[13] "[B]ut everyone thoroughly underestimated the man's boundless determination and reservoir of pride and perspicacity."[14]

24.    Amidst a personal and painful battle with rheumatoid arthritis (which required him to use a cane while walking), Slew did the impossible: "In August 1978, the USTA National Tennis Center debuted, attracting rave reviews and record-setting attendance."[15]

---

[11] Sports History Weekly, *supra* note 9; *see also* Tony Kornheiser, *A Racial Dispute Flares at Forest Hills*, N.Y. Times (Sept. 9, 1977) (attached as Exhibit D).

[12] Amdur, *supra* note 3.

[13] Steve Tignor, *1978: The U.S. Open moves to Flushing Meadows* (June 11, 2015), https://www.tennis.com/news/articles/1978-the-u-s-open-moves-to-flushing-meadows [https://perma.cc/2JN7-7G4P].

[14] Steve Flink, *50 Moments That Mattered: U.S. Open moves to Flushing Meadows*, U.S. OPEN (Aug. 23, 2018), https://www.usopen.org/en_US/news/articles/2018-08-23/2018-08-22_50_moments_that_mattered_us_open_moves_to_flushing_meadows.html [https://perma.cc/3J74-43B5].

[15] INTERNATIONAL TENNIS HALL OF FAME, *Slew Hester*, https://www.tennisfame.com/hall-of-famers/inductees/slew-hester (last visited Feb. 24, 2026).

7

25.    That year, Slew placed a "sprig of potted ivy at the entrance to his new tennis center at Flushing Meadows underneath a handwritten sign: 'Watch Tradition Grow!'"[16]

26.    That sign made a prescient prediction. Within a decade, attendance rose to more than 500,000.[17] By 2010, the tournament was generating an average of "$756,000,000 in direct revenue for the tri-state area—more than any other sports or entertainment event in any city in the United States."[18] The numbers continue to grow.[19] The USTA alone now makes nearly $560,000,000 from the U.S. Open—90% of the organization's total annual revenue from all operations.[20] The tournament's consistent growth is due, in substantial part, to the National Tennis Center—a facility that delivers tennis to the masses, both in-person attendees and television viewers, in a way that Forest Hills never did.

27.    When Slew passed in 1993, Louis Armstrong Stadium still hosted the U.S. Open's premier matches.

---

[16] Robert Mcg. Thomas Jr., *William (Slew) Hester, 80, U.S. Tennis Executive*, N.Y. TIMES (Feb. 10, 1993) (attached as Exhibit E).

[17] INTERNATIONAL TENNIS HALL OF FAME, *supra* note 15.

[18] Exhibit C at 41.

[19] Eric Fisher, *US Open Set Attendance Record, Men's Finals Ratings Surged 82%*, Front Office Sports (Sept. 15, 2025), https://frontofficesports.com/us-open-set-attendance-record-mens-final-ratings-surged-82/#:~:text=The%20men%27s%20final%20at%20the%202025%20US,million%20viewers,%20up%2082%25%20from%20last%20year [https://perma.cc/J5UY-8TUD].

[20] Eben Novy-Williams, *USTA Enters U.S. Open With Near-Record Cash Ahead of $800M Project*, Yahoo Sports (Aug. 27, 2025), https://sports.yahoo.com/article/usta-enters-u-open-near-120000336.html [https://perma.cc/2HWG-9LZ5].

28.     Four years later, Arthur Ashe Stadium was added to the National Tennis Center; it now hosts the tournament's biggest matches.

29.     This fall will mark the 49th consecutive U.S. Open held at the complex in Flushing Meadows. A lot has changed over that half-century. But the site in Flushing Meadows is and always will be "The House That Slew Built."[21]

**B. Box 38G/35G: a Reward for a Lifetime of Service to Tennis**

30.     Slew was honored and rewarded in many ways for his contributions to the sport of tennis.

31.     When the National Tennis Center opened in 1978, a bronze plaque with Slew's likeness was placed at the main entrance to commemorate Slew's contributions. The plaque reads, "His vision and boundless energy created this center."

32.     From 1978 until sometime after Arthur Ashe Stadium opened in 1997, a restaurant named "Slew's Place" was the premier place to eat at the National Tennis Center. A painting of Slew graced the wall over the main bar.

33.     The USTA Board named Slew as the first Chairman Emeritus of the U.S. Open.

34.     In 1981, Slew was inducted into the International Tennis Hall of Fame in Newport, Rhode Island.

---

[21] MISSISSIPPI SPORTS HALL OF FAME AND MUSEUM, *supra* note 2; INTERNATIONAL TENNIS HALL OF FAME, *supra* note 15; *Henley, supra* note 10.

35.     Each year, the USTA presents the Slew Hester Adult Achievement Award to a ranked male and female adult or senior player in the USTA Southern Section in recognition of their outstanding tennis performance.

36.      Around 1980, the USTA Board voted to give Slew and his heirs lifetime box seating at Louis Armstrong Stadium. The box was located at the back of the court, down the middle service line—the best seats in the house.

37.     Slew and his family attended every U.S. Open. It is not just a sporting event for the Hesters; it is a family ritual.

38.     When Slew passed in 1993, the box passed to his children: Plaintiffs Katie and Bill Hester, and their late brother, George Hester. The Hesters continued attending the U.S. Open every year.

39.     Four years after Slew's passing, the USTA opened Arthur Ashe Stadium and moved the tournament's main matches from Louis Armstrong Stadium to Ashe.

40.     Instead of offering the Hesters seats in Arthur Ashe Stadium that were comparable to their box seats in Louis Armstrong Stadium, the USTA stuck them in a corner with sightlines blocked by the umpire's chair. At the same time, the USTA told them to open their pocketbooks to attend.

41.     As Arthur Ashe Stadium was a new facility, the Hesters had no objection to paying something for seats. But they felt that the move of premier matches from Louis Armstrong Stadium to Arthur Ashe Stadium—coupled with the

10

promises made to their father and them about their seats in Armstrong—obligated the USTA to make seats available in a comparable location.

42.    Negotiations proved unsuccessful, forcing the Hesters to seek relief from this Court. *See Kathryn Hester, et al. v. United States Tennis Association, Inc.*, No. 3:97-cv-631-WHB (S.D. Miss. 1997).

43.    In March 1998, the parties reached a settlement agreement (the "Agreement"), a true and correct copy of which is attached as Exhibit F. The case was dismissed accordingly.

44.    In exchange for dropping their claims, the USTA granted the Hesters the following:

a.  subscription rights to Box 38G in Arthur Ashe Stadium upon timely payment *of the applicable annual charges* and subject to the same terms and conditions as other purchasers as more fully set forth in Exhibit A  . . . , beginning in 1998 and continuing *for the lifetime* of the Hesters or until such time as the U.S. Open is no longer contested at the Arthur Ashe Stadium, whichever is earlier;

b.  eight bus passes for transportation to and from the USTA National Tennis Center for the Hesters and their guests during the U.S. Open for the lifetimes of the Hesters or for such time as regular bus service is provided during the U.S. Open, or until the Hesters cease subscribing to Box 38G, whichever is earlier;

c.  not more than thirty-five passes to Slew's Place for each day of the U.S. Open, for the lifetimes of the Hesters or for such time as Slew's Place is in operation and the U.S. Open is contested at the Arthur Ashe Stadium, or until the Hesters cease subscribing to said Box 38G, whichever is earlier; and

d.  the right to use Box 50A in the Louis Armstrong Stadium during the U.S. Open for a period of five years beginning in 1998 without charge (but only if the Hesters continue to subscribe to said Box 38G during said five years).

Exhibit F at 1–2 (emphasis added).

11

45.    Exhibit A to the Agreement, mentioned above, is a Ticket Subscription Invoice showing $45,000.00 as the annual price for Box 38G:

| Description | Level | Box | Row | Seats | Units | Price | Total |
|---|---|---|---|---|---|---|---|
| Platinum Courtside Box | PLATNM | 38 | G | 1- 8 | 8 | 5625.00 | $45,000.00 |
| Stadium 2 Courtside Box | COURT2 | 51 | A | 1- 6 | 6 | 0.00 | $0.00 |
| Marquee Parking Book | | | | | 1 | 0.00 | $0.00 |
| Additional if desired: | Stadium 2 Courtside Box | | | [  ] | @ | 600.00 | $ _____ |
| | Hall of Science Parking | | | [  ] | @ | 250.00 | $ _____ |

| | | | |
|---|---|---|---|
| Invoice Date: | March 3, 1998 | Total Charges: | $45,000.00 |
| Account Name: | The Hester Family | Amount Paid: | $0.00 |
| Account #: | BC - 758 | Balance Due: | $45,000.00 |

46.    Although the Agreement granted the Hesters the right to purchase Box 38G each year for $45,000.00, the Hesters have progressively paid more than that over the years.  But the price increases for many years were gradual and incremental.

47.    Later, when Arthur Ashe Stadium underwent renovations, Box 38G was renumbered Box 35G. But it was the same box seating in the same location. The USTA continued to make the box available to the Hesters.

48.    The Hesters continued purchasing the tickets and attending the U.S. Open every year.

49.    In 2023, the Hesters paid $164,880.00 for Box 35G. No sales tax was charged on these tickets.

50.    In 2024, the Hesters were charged an 8.875% sales tax on the tickets to Box 35G. Tax included, the total cost was $179,521.80. Doing the math, the base cost for the tickets did not increase.

12

51.    In 2025, the total costs rose to $215,416.80 for Box 35G. That represented a hefty jump in base cost. Still, the Hesters paid.

52.    The Agreement contemplated many future contingencies that could divest the Hesters of their rights under the Agreement.

53.    If Arthur Ashe Stadium ceased hosting U.S. Open matches, it would divest the Hesters of their subscription rights to Box 38G/35G in Ashe.

54.    If the buses stopped running or the Hesters stopped subscribing to Box 38G/35G, they'd lose their eight bus passes.

55.    If Slew's Place was shut down or the Hesters stopped subscribing to Box 38G/35G, they'd lose their 35 passes to Slew's Place.

56.    If the Hesters didn't purchase Box 38G/35G each year from 1998 to 2002, it would trigger a duty to pay for the Louis Armstrong Stadium box promised to their dad and his heirs.

57.    Of all these future contingencies contemplated by the Agreement, the USTA's unilateral elimination of box seating (and Box 38G/35G) in Arthur Ashe Stadium is not included.

58.    Yet, in September 2025, the Hesters learned of the USTA's plans to reconfigure the lower bowl of Arthur Ashe Stadium and eliminate all lower-bowl box seating, including Box 35G. Construction is underway.

59.    The U.S. Open continues to be contested at Arthur Ashe Stadium.

60.    The Hesters are alive and well.

13

61.    The Hesters have paid for Box 38G/35G every year since the parties executed the Agreement. They've done so despite the USTA's price increases and its failure to provide other items under the Agreement (e.g., bus passes, passes to Slew's place).

62.    Consequently, the Hesters have more than satisfied their contractual obligations.

63.    The USTA, on the other hand, has materially breached the Agreement by eliminating Box 35G.

64.    In December 2025, the USTA informed the Hesters that their only recourse was to accept, in place of Box 35G or box seating at all, Seats 1–8 on Row E of Section 112—seats in the same vicinity but lacking the defining advantages of box seating, including greater privacy and seat-proximity for hosting friends and family. Other seats in the same section but in split rows were discussed in a subsequent meeting. These substitute seats are not what the parties agreed to in the Agreement.

65.    Incredibly, after unilaterally eliminating the box seating it promised the Hesters, the USTA put a $460,000.00 price tag on the new, non-box seats for the 2026 U.S. Open—more than double what the Hesters paid for superior box seats in 2025 and a major departure from the gradual and incremental price increases of the past.

66.    The USTA's "offer" includes the following future costs for Seats 1–8 on Row E, Section 112 (or other seats in the same section but in split rows): 2027 – $520,000.00; 2028 – $552,000.00; 2029 – $560,000.00; 2030 – $584,000.00.

67.    The Hesters cannot afford to pay these exorbitant prices to attend the U.S. Open. Under protest and with full reservation of their rights, they have resubscribed through 2026. But they will be unable to attend this year in the way they have in the past due to the costs and will have to utilize the U.S. Open's resale platform to try to recoup the expense of keeping their rights alive.

68.    The USTA knew about the Agreement when it eliminated Box 35G. It willfully ignored its obligations under the Agreement and pressed forward with complete disregard for the Hesters' rights. And having deprived them of the box seating promised under the Agreement, the USTA has now increased the price to a point where the Hesters will be unable to attend—box seats or otherwise.

## C.    A String of Broken Promises

69.    The USTA's conduct with respect to the Hesters' box seating is but one example of a slow push to diminish Slew's legacy and renege on promises made to him and to his heirs. That push began shortly after Slew passed away in 1993.

70.    For example, when Arthur Ashe Stadium was built in 1997, the USTA moved Slew's plaque from the main entrance of the National Tennis Center—where it had been prominently displayed for 20 years—to a location off the side of Louis Armstrong Stadium.

15

71.    When Louis Armstrong Stadium was demolished and rebuilt in 2016, the USTA moved Slew's plaque to one of Arthur Ashe Stadium's least-used exit ramps.

72.    At the 2025 U.S. Open, the Hesters made a special trip to that exit ramp to see their dad's plaque. It wasn't there. They scoured the National Tennis Center looking for it, but they never found it. If it is still hanging, it is apparently hanging in a place that isn't readily accessible by patrons.

73.    Another example: as stated above, the Agreement required the USTA to provide 35 passes to "Slew's Place" every year. The Hesters never received the first pass. When "Slew's Place" was converted to another restaurant/bar, the USTA removed Slew's painting. And the USTA never offered the Hesters any passes or accommodations to the new restaurant/bar.

74.    When the rebuilt Louis Armstrong Stadium opened in 2018, the USTA moved the Hesters from the seats they'd had since 1980, when the USTA Board voted to grant Slew and his heirs a lifetime box. Six center-baseline seats altogether on the first row became seats in the upper corner of the lower bowl. Meanwhile, seat holders who had never had seats down the middle of the baseline were given prime seats in "new" Armstrong. After the Hesters lodged complaints, the USTA moved their seats back to the first row. But the new seats were straddling the doubles alley (far from the center baseline) and split 4/2 with a TV camera lodged in the middle.

75. The USTA's decision to eliminate the Hesters' lifetime box and offer as a consolation prize inferior seats at more than double the cost is but the latest chapter in the USTA's attempts to freeze the Hesters out and diminish Slew's legacy.

76. Of course, the USTA's short memory disappoints Bill and Katie. They take great pride in their dad's contributions to tennis and believe strongly that the USTA should keep his legacy alive at the U.S. Open. After all, it was "*his* vision and boundless energy [that] created this center"; Flushing Meadows is and always will be "The House That *Slew* Built."

77. But this lawsuit is about more than hurt feelings and vindicating Slew's legacy. The USTA entered into a contract with Katie and Bill. That contract *required* the USTA to make Box 38G/35G at Arthur Ashe Stadium available to the Hesters for the remainder of their lives, so long as they paid the "applicable annual charge" of $45,000.00.

78. The Hesters haven't missed a payment in 27 years. They've paid more than the Agreement's "applicable annual charges."

79. But the USTA's most recent actions ensure that Bill and Katie cannot afford or access equivalent seating for the 2026 U.S. Open (or any year thereafter). In this way, the USTA has deprived the Hesters of the Agreement's core benefits, thereby constituting a material breach.

80. This deprivation was intentional, as was every other slight to the Hester family over the last 30 years. The USTA's actions are opportunistic and

17

designed to eliminate the Hesters' lifetime rights. The USTA has trampled the implied covenant of good faith and fair dealing. Injunctive relief is required, and punitive damages are warranted.

## CAUSES OF ACTION

## COUNT ONE – BREACH OF CONTRACT

81.    Plaintiffs incorporate by reference as though fully set forth herein the factual allegations set forth in paragraphs 1 through 80.

82.    Plaintiffs and the USTA are parties to a binding, enforceable Agreement signed by Plaintiffs on March 12, 1998, and by the USTA on March 17, 1998. *See* Exhibit F.

83.    The Agreement resolved federal-court litigation between the parties in the Southern District of Mississippi. *See Kathryn Hester, et al. v. United States Tennis Association, Inc.*, No. 3:97-cv-631-WHB (S.D. Miss. 1997).

84.    Under the Agreement, the USTA granted Plaintiffs lifetime subscription rights to Box 38G in Arthur Ashe Stadium (later renumbered Box 35G).

85.    Under the Agreement, every year that the U.S. Open is contested at Arthur Ashe Stadium, the USTA is required to make Box 38G/35G available to Plaintiffs "upon timely payment of the applicable annual charges."

86.    The Agreement established $45,000.00 as the Hesters' "applicable annual charges" for Box 38G/35G.

87. Under the Agreement, Plaintiffs' rights may not divest unless one of the following events occurs: (1) both Plaintiffs die, or (2) the U.S. Open is no longer contested at Arthur Ashe Stadium.

88. Both Plaintiffs are alive and well.

89. The U.S. Open continues to be contested at Arthur Ashe Stadium.

90. Plaintiffs have fully performed their obligations under the Agreement for nearly three decades, including "timely payment of the applicable annual charges" (and sometimes much more) every year from 1998 through 2025.

91. Every year since the parties executed the Agreement—except 2020, when COVID prevented spectators from attending—at least one Plaintiff has attended the U.S. Open and sat in Box 38G/35G at Arthur Ashe Stadium.

92. Every year since the parties executed the Agreement—except 2020, when COVID prevented spectators from attending—Plaintiffs have exercised their subscription rights by paying to the USTA at least the "applicable annual charges" under the Agreement.

93. The USTA has announced that it will not make Box 35G/38G available to the Hesters for the 2026 U.S. Open and has informed Plaintiffs that their only recourse is to accept, in place of Box 38G/35G, non-box seating at Seats 1–8 on Row E of Section 112 (or seats in the same section but in split rows) in the newly configured Arthur Ashe Stadium.

19

## <u>COUNT TWO – BAD FAITH BREACH OF CONTRACT</u>

94.   Plaintiffs incorporate by reference as though fully set forth herein the factual allegations set forth in paragraphs 1 through 80.

95.   Plaintiffs also incorporate by reference as though fully set forth herein the allegations set forth above in paragraphs 81 through 93 regarding the USTA's breach of the Agreement, each of which is also applicable to the related cause of action set forth in this Count Two.

96.   The Agreement, like all contracts in Mississippi, includes an implied covenant of good faith and fair dealing, which obligates the parties to refrain from intentionally depriving the other party of the benefit of their bargain in a manner that violates standards of decency, fairness, or reasonableness.

97.   For nearly three decades, Plaintiffs have performed every obligation required of them under the Agreement. They purchased Box 38G/35G each year; paid each annual charge, including charges far exceeding the Agreement's "applicable annual charges" and amounts that could be explained by new taxes or inflation; and honored every condition necessary to retain their lifetime subscription rights to Box 38G/35G.

98.   The USTA, on the other hand, has engaged in conduct that intentionally undermined, eroded, and ultimately sought to extinguish Plaintiffs' rights under the Agreement.

99.   Even considered in a vacuum, the USTA's intentional elimination of Box 35G—done with actual knowledge of Plaintiffs' rights under the Agreement—

constitutes bad faith. As does the USTA's historical imposition on Plaintiffs of prices for Box 35G that *far* exceed the Agreement's "applicable annual charges." As does the USTA's failure to provide the bus passes and passes to Slew's Place that it promised under the Agreement. As does the USTA's take-it-or-leave-it offer of new, inferior seats at a price point that dwarfs both the Agreement's "applicable annual charges" and any amount that the USTA has previously charged Plaintiffs for the Box 38G/35G seats promised to them under the Agreement.

100.    Considered alongside the events over the last 30 years, however, the USTA's bad faith is apparent. The recent events leading to this lawsuit are the culmination of a decades-long pattern of actions by the USTA that disrespect Slew Hester's legacy and disregard the promises made to him before he passed and to his family thereafter.

101.    This pattern of conduct by the USTA, detailed *supra* ¶¶ 30–80, demonstrates a consistent and intentional disregard for the Hester family's rights and for Slew's legacy. Indeed, the Hesters have already been forced to resort to litigation once for the USTA's failure to honor its obligations. Now, years later, the USTA tramples the Agreement reached as a result of that litigation.

102.    This pattern of conduct also illuminates the USTA's motive and mindset when, in late 2025, it seized the plans to redesign Arthur Ashe Stadium as an opportunity to finally extinguish a lifetime contractual obligation it viewed as burdensome or inconvenient.

103. The USTA's actions stretch beyond simple breach of contract. They were willfully calculated to eliminate the Hesters' rights under the Agreement. Indeed, the USTA fully understood the unequal bargaining power between itself and the Hesters, and it exploited the Arthur Ashe Stadium redesign as an opportunity to charge the Hesters a sum of money it knew they could not and would not pay, effectively relieving the USTA of its obligation to provide seating to Slew's children.

104. The USTA acted intentionally, with actual malice, and with conscious disregard for Plaintiffs' rights. Accordingly, Plaintiffs are entitled to punitive damages in an amount sufficient to punish such conduct and deter it in the future.

105. Plaintiffs are also entitled to costs and attorneys' fees incurred as a result of the USTA's bad-faith breach of the Agreement.

**COUNT THREE – INJUNCTION AND SPECIFIC PERFORMANCE**

106. The USTA has informed Plaintiffs that these new, inferior seats will cost Plaintiffs $460,000.00 for the 2026 U.S. Open—more than double what Plaintiffs paid for superior box seats in 2025 and over $400,000.00 more than the "applicable annual charges" incorporated into the Agreement.

107. The USTA has informed Plaintiffs that, for upcoming U.S. Opens, they must pay the following prices for these new, inferior seats: 2027 – $520,000.00; 2028 – $552,000.00; 2029 – $560,000.00; 2030 – $584,000.00.

108. The chart below shows the price history and future prices relative to the "applicable annual charges" incorporated into the Agreement.

22

| Year | Price | "Applicable Annual Charges" | Difference |
|---|---|---|---|
| 1998 | $ 45,000.00 | $ 45,000.00 | $ - |
| 2023 | $ 164,880.00 | $ 45,000.00 | $ 119,880.00 |
| 2024 | $ 179,521.80 | $ 45,000.00 | $ 134,521.80 |
| 2025 | $ 215,416.80 | $ 45,000.00 | $ 170,416.80 |
| 2026 | $ 460,000.00 | $ 45,000.00 | $ 415,000.00 |
| 2027 | $ 520,000.00 | $ 45,000.00 | $ 475,000.00 |
| 2028 | $ 552,000.00 | $ 45,000.00 | $ 507,000.00 |
| 2029 | $ 560,000.00 | $ 45,000.00 | $ 515,000.00 |
| 2030 | $ 584,000.00 | $ 45,000.00 | $ 539,000.00 |

109. Plaintiffs cannot afford to pay $460,000.00 to attend the 2026 U.S. Open. However, under protest and with full reservation of their rights, they have resubscribed to ensure their subscription rights remain intact through 2026. But they will be unable to attend due to the costs and will have to utilize the U.S. Open's resale platform to try to recoup the expense of keeping their rights alive during the pendency of this lawsuit. They are deprived of the experience the Agreement was supposed to protect.

110. Plaintiffs cannot afford to pay the exorbitant prices listed for 2027–2030.

111. In 2023, 2024, and 2025, the USTA materially breached the Agreement by charging Plaintiffs *far* more than the Agreement's "applicable annual charges," even if one accounts for reasonable upticks due to general economic inflation.

112. The USTA materially breached the Agreement by eliminating Box 38G/35G while Plaintiffs are still alive and while the U.S. Open continues to be contested at Arthur Ashe Stadium.

23

113.    The USTA materially breached the Agreement by imposing on Plaintiffs a price for new, inferior seats that is more than double the amount the USTA has ever charged Plaintiffs for the box seating promised to them under the Agreement.

114.    The Agreement grants Plaintiffs unique and irreplaceable lifetime access to the global spectacle that is the U.S. Open.

115.    Specifically, the Agreement grants Plaintiffs lifetime subscription rights to a specific set of box seats (Box 35G) in a specific stadium (Arthur Ashe Stadium) located in a complex known as "The House That Slew [their father] Built."

116.    The USTA's elimination of Box 35G, and its refusal to provide equivalent seating at fair and contractually consistent pricing, threatens to permanently deprive Plaintiffs of the benefit of their bargain under the Agreement.

117.    That deprivation cannot be adequately compensated by money damages.  Money cannot fully compensate the Hesters for their special affinity for attending the U.S. Open—the tournament their dad made what it is today.

118.    The USTA can feasibly deliver to Plaintiffs what they bargained for: the right to purchase Box 35G at the "applicable annual charges" under the Agreement. Yet, the USTA has intentionally chosen to deprive Plaintiffs of their rights under the Agreement.

119.    Accordingly, Plaintiffs are entitled to an order for the relief pleaded below, including the relief classifiable as injunctive relief (mandatory and/or prohibitory) and specific performance.

24

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs William E. Hester, III and Kathryn H. Hester respectfully request that the Court:

a. Exercise jurisdiction over the USTA;

b. Award Plaintiffs compensatory damages of at least $75,000, the exact amount to be proven at trial, for the amounts Plaintiffs have been forced to pay in excess of the Agreement's applicable annual charge and for other damages they have suffered as a result of the USTA's breach of the Agreement;

c. Issue a declaration that the USTA materially breached the Agreement by eliminating Box 35G while Plaintiffs are still alive and while the U.S. Open continues to be contested at Ashe;

d. Issue a declaration that the USTA materially breached the Agreement by imposing on Plaintiffs a price for new, inferior seats that far exceeds both the Agreement's "applicable annual charges" and any amount that the USTA has previously charged Plaintiffs for the Box 35G seats promised to them under the Agreement;

e. Preliminarily and permanently enjoin the USTA from implementing or finalizing any stadium configuration that impairs or eliminates Plaintiffs' lifetime rights under the Agreement, specifically, from eliminating Box 35G while Plaintiffs are still alive and while the U.S. Open continues to be

25

contested at Arthur Ashe Stadium (regardless of any future renaming of the stadium);

f.  Award specific performance under the Agreement, ordering the USTA to provide Box 35G to Plaintiffs for the remainder of their lifetimes at a price consistent with historical "applicable annual charges" under the Agreement;

g.  In the event Box 35G has already been demolished at the time of this Complaint, enter an Order either (i) requiring the USTA to restore Box 35G and provide the same to Plaintiffs for the remainder of their lifetimes at a price consistent with historical prices the Hesters' have paid for Box 35G, or (ii) requiring the USTA to provide equivalent premium seating to Plaintiffs for the remainder of their lifetimes at a price consistent with historical prices the Hesters' have paid for Box 35G;

h.  Award Plaintiffs punitive damages in an amount sufficient to punish the USTA's bad-faith conduct and deter it in the future;

i.  Award Plaintiffs their attorneys' fees and expenses;

j.  Award Plaintiffs the costs of this proceeding;

k.  Award such other relief as to which Plaintiffs may show themselves entitled.

Plaintiffs demand a trial by jury.

**RESPECTFULLY SUBMITTED**, this 9th day of March 2026.

> */s/Simon T. Bailey*
> Simon T. Bailey (MSB 103925)

27

P. Garner Vance (MSB 106706)
BRADLEY ARANT BOULT CUMMINGS LLP
One Jackson Place
188 E. Capitol Street, Suite 1000
Jackson, MS 39201
(601) 948-8000
sbailey@bradley.com
gvance@bradley.com

*Attorneys for Plaintiffs William E. Hester, III and Kathryn H. Hester*