UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WILLIAM E. HESTER, III, and KATHRYN H.
HESTER,

                          Plaintiffs,

        -against-

UNITED STATES TENNIS ASSOCIATION,
INC.,

                          Defendant.

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: ___7/14/2026___ |

26 Civ. 3701 (AT)

**<u>ORDER</u>**

ANALISA TORRES, District Judge:

Plaintiffs, William E. Hester III and Kathryn H. Hester (collectively, "Plaintiffs" or the "Hesters"), allege that the United States Tennis Association, Inc. ("USTA") breached a 1998 settlement agreement ("the Agreement"), under which the USTA granted Plaintiffs the right to purchase Box 35G in the Arthur Ashe Stadium ("Arthur Ashe") at the U.S. Open Tennis Championships ("U.S. Open") held annually in New York. *See generally* Compl., ECF No. 1. Plaintiffs assert breach of contract claims arising out of renovations to Arthur Ashe that have resulted in the demolition of Box 35G. *See id.* ¶¶ 81–119; *see also* Opp. at 2, ECF No. 18 (stating that the box has already been demolished).

Before the Court is Plaintiffs' motion for a preliminary injunction. *See* Mot., ECF No. 6; Mem., ECF No. 7. Plaintiffs seek an order directing the USTA to either (i) "restore Box 35G before the 2026 U.S. Open and offer it—at a price consistent with historical 'applicable annual charges' under the[ir] Agreement," or (ii) offer Plaintiffs, for the 2026 US Open and any subsequent U.S. Open until the entry of judgment, "eight box seats" at a "[p]rice consistent with historical 'applicable annual charges' under the Agreement" and "[l]ocated in the exact same area of Arthur Ashe . . . as

former Box 35G."  Mot. at 1–2; *see also* Opp. at 2 (stating that Box 35G has been demolished).  For the reasons stated below, Plaintiffs' motion is denied.[1]

## BACKGROUND

I.   Factual Background

The USTA is the national governing body for the sport of tennis and the host of the U.S. Open.  Opp. at 5.  Plaintiffs are the son and daughter of W.E. "Slew" Hester, a decorated tennis player and a former president of the USTA and chairman of the U.S. Open.  Compl. ¶¶ 10–16, 38. Slew Hester served as a highly regarded figure in American tennis, influencing the U.S. Open's move to its present-day home at Flushing Meadows and leading the tournament's transformation into a "global . . . spectacle."  *Id.* ¶¶ 1, 26–29.  In recognition of his contributions to tennis, in about 1980, the USTA Board voted to provide Slew and his heirs "lifetime box seating" at Louis Armstrong Stadium, then the primary stadium for U.S. Open matches.  *Id.* ¶ 36.  When Slew passed away in 1993, the seating passed to his children: Plaintiffs Kathryn and William Hester and their late brother, George Hester.  *Id.* ¶ 38.

In 1997, the USTA opened Arthur Ashe and moved the tournament's main matches there from Louis Armstrong Stadium.  *Id.* ¶ 39.  Because of this move, the USTA provided Plaintiffs with seats at Arthur Ashe, and, for the first time, required Plaintiffs to pay for their seating.  *Id.* ¶ 40. Plaintiffs deemed the replacement seats inferior to their box seats at Louis Armstrong.  *See id.* ¶ 40. After failed negotiations over their seats, Plaintiffs sued.  *See Hester v. U.S. Tennis Ass'n, Inc.*, No. 97 Civ. 631 (S.D. Miss. 1997); Compl. ¶ 42.  A year later, in 1998, the parties settled.  Compl. ¶ 43.

Among other things, the parties' settlement agreement (the "Agreement") entitled the Hesters to:

> [S]ubscription rights to Box 38G in Arthur Ashe Stadium upon timely payment of
> the applicable annual charges and subject to the same terms and conditions as other

---

[1] The Court finds that it can resolve the issues raised by Plaintiffs' motion on the papers submitted.

purchasers as more fully set forth in Exhibit A . . . beginning in 1998 and continuing for the lifetime of the Hesters or until such time as the U.S. Open is no longer contested at the Arthur Ashe Stadium, whichever is earlier;

Agreement ¶ (B)(1), ECF No. 1-6.

Exhibit A to the Agreement sets forth the "1998 Ticket Subscription Invoice," reflecting $45,000 as the annual price for Box 38G on March 3, 1998. *See id.* at 5.

| Description | Level | Box | Row | Seats | Units | Price | Total |
|---|---|---|---|---|---|---|---|
| Platinum Courtside Box | PLATNM | 38 | G | 1- 8 | 8 | 5625.00 | $45,000.00 |
| Stadium 2 Courtside Box | COURT2 | 51 | A | 1- 6 | 6 | 0.00 | $0.00 |
| Marquee Parking Book | | | | | 1 | 0.00 | $0.00 |
| _Additional if desired:_ Stadium 2 Courtside Box | | | | [  ] | @ | 600.00 | $ _____ |
| Hall of Science Parking | | | | [  ] | @ | 250.00 | $ _____ |

| | | | |
|---|---|---|---|
| Invoice Date: | March 3, 1998 | Total Charges: | $45,000.00 |
| Account Name: | The Hester Family | Amount Paid: | $0.00 |
| Account #: | BC - 758 | Balance Due: | $45,000.00 |

Every year since the execution of the Agreement, with the exception of the 2020 U.S. Open for which the USTA banned spectators due to COVID-19, Plaintiffs paid the applicable annual charges in a timely manner. *See* Wiliam Hester III Decl. ¶¶ 6-7, ECF 6-2.

In May 2025, the USTA announced a "grand makeover" to the Arthur Ashe Stadium. *See* ECF No. 17-1 at 4 (press release). A few months later, in September 2025, Defendant informed Plaintiffs that the reconfiguration would eliminate Box 35G, requiring new seating arrangements for Plaintiffs. *See* Compl. ¶ 63; ECF No. 17-1 at 12–15. The reconfigured Arthur Ashe would have no box seats. *See, e.g.*, ECF No. 17-1 at 24 (letter from Plaintiffs to USTA's general counsel); Opp. at 16. Defendants offered Plaintiffs the opportunity to instead purchase eight courtside seats in near proximity to the current location of Box 35G. *See* Opp. at 2 (noting that Plaintiffs concede that the seats "closely mirror where the eight seats in Box 35G . . . were located"); ECF No. 17-1 at 25 (letter from Plaintiffs to USTA's general counsel); ECF No. 17-1 at 18 (email from USTA employee to

3

Plaintiffs confirming Plaintiffs' eight replacement seats).  Ultimately, Plaintiffs deemed the offer of eight seats to be insufficient and in violation of the Agreement, although Plaintiffs agreed to accept the seats if there were no other option and with full reservation of Plaintiffs' rights under the Agreement.  *See* Hester Decl. ¶¶ 16–22; ECF No. 17-1 at 18.

## II.   Procedural History

On March 6, 2026, Plaintiffs commenced this action in the United States District Court for the Southern District of Mississippi.  *See* Compl.  One month later, Plaintiffs moved for a preliminary injunction.  *See* Mot.  The USTA moved to dismiss for lack of personal jurisdiction, or, alternatively, to transfer the case to the Southern District of New York.  *See* ECF No. 9.  On May 4, the Honorable Carlton W. Reeves denied the USTA's motion to dismiss but granted the motion to transfer pursuant to 28 U.S.C. § 1404(a).  *See* ECF No. 22.  The next day, this action was transferred to the Southern District of New York and assigned to the undersigned.  *See* ECF No. 23.

## DISCUSSION

## I.   Legal Standard

Preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (internal quotation marks and citation omitted).  To obtain a preliminary injunction, a party must ordinarily establish:

> (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest.

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (internal quotation marks and citation omitted).

II.       Preliminary Injunction

Plaintiffs have failed to show irreparable harm, and, accordingly, their motion for a preliminary injunction is denied.  "A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'"  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)).  "Essential to a showing of irreparable harm is unavailability or at least inadequacy of a money damages award."  *Shady v. Tyson*, 5 F. Supp. 2d 102, 106 (E.D.N.Y. 1998).

Plaintiffs argue that money damages would be inadequate to compensate them if they wait for a decision on the merits.  Plaintiffs identify two main harms—first, having to pay more than $45,000 per seat and second, losing box seats.  As to the first harm, Plaintiffs have made no non-conclusory showing that the increased price will preclude the two of them from attending the 2026 U.S. Open, and, therefore, the Court finds that this harm can be remedied by monetary damages.

As to the loss of their box seats, Plaintiffs argue that this harm is irreparable because of the unique nature of box seats.  Box seats, Plaintiffs explain, "make[] a difference to real tennis fans, for whom the protection of a rail (a key feature of a box) limits interruptions and therefore allows maximum focus on the tennis."  Reply at 5, ECF No. 20; *see* Mem. at 9 ("[T]he Agreement guaranteed *box* seating, which offers greater privacy, the ability to host guests together in a railed seating area, and an uninterrupted experience free of other patrons squeezing by to reach their seats." (emphasis in original)).  Plaintiffs further argue that because of their "deep pride in their father's role" in the creation of the U.S. Open, there are "intangible losses associated with the end of a multigenerational tradition."  *Id.* at 10.

Neither argument succeeds.  The harm Plaintiffs stand to suffer is the loss of an "uninterrupted" tennis viewing experience.  *See* Mem. at 9.  This harm is speculative—Plaintiffs have not adduced evidence regarding the likelihood of interruptions in their tennis viewing experience in

5

the replacement seats compared to a box with a railing.  *See Emons Indus., Inc. v. Liberty Mut. Ins. Co.*, 749 F. Supp. 1289, 1292 (S.D.N.Y. 1990) ("[A] plaintiff seeking to establish irreparable injury 'must demonstrate an injury that is neither remote nor speculative, but actual and imminent.'" (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, (2d Cir. 1989) 888 F.2d 969, 975 (2d Cir. 1989)).  And, to the extent the loss of box seating is harmful, Plaintiffs have not shown that monetary damages would be an inadequate remedy.  A jury could reasonably estimate the value of the box seat experience by, for example, comparing the historical difference in market value between box seats and similar courtside seats at the U.S. Open.  With respect to their familial pride, Plaintiffs have not demonstrated that there is an actual harm stemming from sitting in "premium courtside" seats, Opp. at 3, rather than in seats that have a private railing.  *See* Mem. at 9; *Benaroya v. Nationwide Mut. Ins. Co. of Am.*, No. 18 Civ. 4823, 2020 WL 1863287, at *6 (E.D.N.Y. Jan. 22, 2020) ("The harms contemplated by the extraordinary remedy of the preliminary injunction must be tangible and non-speculative.").  Therefore, the Court does not find that Plaintiffs have made a sufficient showing of irreparable injury at this stage of litigation.

Finally, Plaintiffs' delay in moving for a preliminary injunction weighs against finding irreparable harm.  *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 39 (2d Cir. 1995) ("A district court should generally consider delay in assessing irreparable harm.").  Plaintiffs state that they "learned of the USTA's plans to reconfigure the lower bowl of Arthur Ashe Stadium and eliminate all lower-level box seating, including Box 35G" in September 2025.  Compl. ¶ 58. Plaintiffs did not, however, move for preliminary relief for at least another six months.  *See* Mot. (filed April 2, 2026).  A "failure to act sooner 'undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.'" *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985) (quoting *Le Sportsac, Inc. v. Dockside*

*Rsch., Inc.*, 478 F. Supp. 602, 609 (S.D.N.Y. 1979)); *see Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 439 (E.D.N.Y. 2013).

Plaintiffs justify their delay on the ground that they "tried very hard to reach an agreement with the USTA to avoid this lawsuit." Reply at 7. Plaintiffs have not, however, shown they had any "reason to believe [USTA] would settle" and provide them with box seating. *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 300–01 (S.D.N.Y. 2021). After all, no box seats exist in the planned Arthur Ashe reconfiguration. *See* Opp. at 16; Mem. at 3. "Attempts to settle can provide a buffer only when there is a prospect of resolution, and there has been no such showing here." *Two Hands IP LLC*, 563 F. Supp. 3d at 301. Ultimately, Plaintiffs' decision to wait until April 2026 to bring their motion "suggests that there is, in fact, no irreparable injury." *Citibank*, 756 F.2d at 277 (citation omitted). Because Plaintiffs have not shown irreparable harm, their motion for a preliminary injunction is denied, and the Court need not address Plaintiffs' likelihood of success on the merits or the remaining preliminary injunction factors.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction is DENIED. Defendants' motion to stay the resolution of Plaintiffs' motion pending the determination of venue is DENIED as moot.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 6 and 11.

SO ORDERED.

Dated: July 14, 2026
New York, New York

_____
ANALISA TORRES
United States District Judge